UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEBRA PERSINGER-CERNY, | ) | CASE NO. 1:18CV1401 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

Plaintiff Debra Persinger-Cerny ("Plaintiff") requests judicial review of the decision of the Commissioner of Social Security Administration ("Defendant") denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1. In her brief on the merits, filed on October 25, 2018, Plaintiff asserts that the administrative law judge ("ALJ") erred at step 5 of the evaluation because the ALJ (1) lacked substantial evidence to support his residual functional capacity ("RFC") finding that Plaintiff does not require the use of a cane; and (2) improperly discounted the opinion evidence of Dr. Wax. ECF Dkt. #19 at 8-12. Defendant filed a response brief on January 30, 2019. ECF Dkt. #22.

For the following reasons, the undersigned recommends that this Court AFFIRM the decision of the ALJ and dismiss the instant case in its entirety with prejudice.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for SSI on April 28, 2015, alleging a disability onset date of January 1, 2013[2]. ECF Dkt. #17 ("Tr.") at 164.[3] The application was denied initially and upon

---

[1] On January 23, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2] The ALJ incorrectly noted the application filing date as April 7, 2015 and the initial alleged disability onset date as beginning on April 9, 2015. ECF Dkt. #17 at 15.

[3] All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than the page numbers assigned when the Transcript was compiled. This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing

reconsideration. *Id.* at 101, 109. Plaintiff then requested a hearing before an ALJ and a hearing was held on June 21, 2017. *Id.* at 31, 114, 119. During the June 21, 2017 hearing, Plaintiff moved to amend the onset date to April 7, 2015. *Id.* at 36-37, 180. On October 12, 2017, the ALJ issued a decision concluding that Plaintiff was not disabled. *Id.* at 12-26. Subsequently, the Appeals Council denied Plaintiff's request for review. *Id.* at 1. Accordingly, the decision issued by the ALJ on October 12, 2017, stands as the final decision.

The instant suit was filed by Plaintiff on June 20, 2018. ECF Dkt. #1. Defendant answered on September 4, 2018. ECF Dkt. #16. Plaintiff filed a brief on the merits on October 25, 2018. ECF Dkt. #19. Defendant filed a response brief on January 30, 2019. ECF Dkt. #22. Plaintiff did not file a reply brief.

## II. MEDICAL AND TESTIMONIAL EVIDENCE

### A. Medical Evidence

Plaintiff's amended disability onset date is April 7, 2015. Tr. at 180. Her extensive medical history shows a combination of physical and mental impairments. Medical records from MetroHealth Medical Center ("MHMC") indicate that since late 2013, Plaintiff suffered from anxiety, chronic obstructive lung disease, depressive disorder, hypertensive disorder, insomnia, and tobacco dependence syndrome. *Id.* at 359. Since 2014, Plaintiff also suffered from cervical radiculitis and degeneration of lumbosacral intervertebral disc. *Id.*

On June 1, 2013, Plaintiff underwent an MRI procedure of the lumbar spine, which revealed the following for L5-S1: minimal retrolisthesis; disc bulging and small inferiorly directed disc extrusion; moderate facet hypertrophic change; moderate bilateral lateral recess narrowing and impinging on the descending S1 nerve root sleeves bilaterally; thecal sac was otherwise patent; mild to moderate left foraminal narrowing. *Id.* at 520-21.

On January 22, 2015, Plaintiff visited MHMC with complaints of increased back pain. *Id.* at 675-76. Her triage showed mostly unremarkable findings, except for tenderness to palpations over

---

the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

the right and mid line L3-S1, SLR illicits lumbar pain, and a Patrick's (FABER) test of negative bilateral. *Id.* at 677.

On March 11, 2015, Plaintiff was referred to and visited Dr. Jospeh Hanna, M.D., a neurologist, for the reason of addressing a presumed stroke/cerebrovasc accident that may have occurred on December 22, 2014[4]. *Id.* at 347. After his examination, Dr. Hanna noted that Plaintiff showed signs of a neurologic syndrome, which was prolonged and complicated because she had a prior traumatic brain injury ("TBI") with left paresis and a differential diagnosis ("DDx") that included seizure, stroke, and migrane. *Id.* at 351.

On March 19, 2015, Plaintiff returned to MHMC for a pain management follow-up. *Id.* at 661. She complained of worsening pain that was sharp and continuous without weakness of arms or legs and that was made worse by taking care of her daughter. *Id.* At this time, Plaintiff was taking Ultram and Percocet to reduce her pain. *Id.*

On April 16, 2015, Plaintiff returned to MHMC for another pain management follow-up, complaining of intense, continuous, throbbing, and aching pain that was made worse by movement and by nothing. *Id.* at 551. She also had left shoulder joint pain. *Id.* She exhibited tenderness to palpations over hyperalgesia in the lumbar spine, especially where the disk was pushing out. *Id.* at 554.

On April 22, 2015, Plaintiff returned to MHMC for a follow-up visit and complained that the Percocet was not helping her pain and that she experienced pain in her left shoulder, neck, and scapula that keeps her awake at night. *Id.* at 545. She had a history of lumbar injections providing no relief. *Id.* She exhibited normal and tender left paraspinal C3-C7 and left suprascapular tenderness. *Id.* at 547. The next day, April 23, 2015, Plaintiff underwent an X-ray examination of her cervical spine, which revealed degenerative disc narrowing at C5-6 and C6-7. *Id.* at 559. On May 14, 2015, Plaintiff returned for another pain management follow-up visit, but her course of pain and treatment regimen remained steady and unchanged since her last visit. *Id.* at 540.

---

[4]Under the "Reason For Visit" section, the stroke/cerebrovasc accident was mistakenly presumed to be on 12/22/15, which is a typographical error because that is a later date than that visit .

On July 7, 2015, Plaintiff visited Dr. Wax, M.D. for a psychological evaluation. *Id.* at 455. She was referred to Dr. Wax by Opportunities for Ohioans with Disabilities ("OOD") for a psychological evaluation related to her claim for mental disability benefits. *Id.* Her chief psychological complaints about why she was unable to work was because she has panic attacks, hears voices, and cannot sleep. *Id.* The psychological report noted that Plaintiff "appeared in physical distress, needing to stand several times during the evaluation," and she had little use of her left arm due to partial paralysis from a prior stroke. *Id.* at 457. She also appeared sad and tired, and she complained of memory problems and back pain. *Id.* at 457-58. The report diagnosed her under the Diagnostic Statistical Manual ("DSM") 5 with cognitive disorder as a result of a stroke on 12/25/2014 and with depressive disorder NOS. *Id.* at 459. Dr Wax stated that:

> [Plaintiff] would be able to understand, remember, and carry out simple instructions on a job. Her estimated IQ based upon sensorium cognitive functioning tasks is of someone functioning in the borderline range of intelligence. Though this individual could understand, remember, and carry out simple instructions, she would have difficulty with more complicated instructions with her stating she now has memory problems.

*Id.* He also stated that she "would not be able to maintain attention and concentration on a job due to her cognitive problems and depression," but she "would respond appropriately to supervisors and coworkers in a work setting." *Id.* at 460. He further noted that she had "mental drifting" during the evaluation and "would have difficulty responding appropriately to work pressures in a work setting." *Id.*

Plaintiff returned to MHMC for pain management follow-up treatments on July 15, 2015 and August 13, 2015. *Id.* at 527-30, 523-25. On September 8, 2015, Plaintiff underwent a pulmonary function study, which revealed moderately severe obstruction. *Id.* at 461-72.

On September 9, 2015, Plaintiff visited Dr. Wax again, who administered a Wechsler Adult Intelligence Scale IV test (WAIS-IV) and a Wechsler Memory Scale IV test (WMS-IV). *Id.* at 475. Plaintiff's IQ was 72, which is in the borderline range. *Id.* Her memory test showed significant differences among her index scores, suggesting organic problems. *Id.*

On October 8, 2015, Plaintiff again visited MHMC, with complaints of lower back and shoulder pain, and her pain level was about a 6/10. *Id.* at 518. On the same day, Plaintiff also

underwent an initial physical therapy evaluation. *Id.* at 620. Plaintiff rated her pain 4-5/10 with medication, and her functional limitations were that she was independent with self care and daily living activities, but she was unable to lift and carry a laundry basket and experienced increased pain/difficulty with household chores. *Id.* at 622. Her referring provider, Dr. Astley, M.D., provided the following diagnoses: cervical radiculitis, cervical spondylosis without myelopathy, thoracic or lumbosacral neuritis or radiculitis. *Id.* at 620-21. Plaintiff's therapy prognosis was labeled "good." *Id.* at 625. Plaintiff returned to physical therapy on October 15, 2015, and she reported 0/10 pain level in her neck but higher in her lower back. *Id.* at 612. She was noted to have arrived at her appointment with a straight cane. *Id.* On November 16, 2015, Plaintiff returned to physical therapy and reported pain as a 5/10 in her neck and higher in the lower back, and she again arrived with a straight cane. *Id.* at 608-09.

On December 9, 2015, Plaintiff returned to MHMC for a follow up visit and complained of pain in her lower back that she described as stabbing, intense, intermittent, and made worse by forward flexion, lateral flexion, and rotation. *Id.* at 512. Her reported duration for standing was less than 5 minutes, sitting less than 5 minutes, and walking less than 5 minutes. *Id.* She exhibited tenderness in her right shoulder and lumbar back, and her treatment plan consisted of the following: pool therapy, physical therapy, smoking cessation, educated on importance of back protection and improving strength and flexibility, pending plan for MNBB L3, 4, 5 right side, changed dosage of Percocet, stop taking Ms Contin because of headaches, refill Ambien, RTC for 1 month. *Id.* at 514, 516.

On January 1, 2016, Plaintiff returned to MHM's pain management clinic for pain secondary to L5-S1 DDD. *Id.* at 598. She was considered to be in stable condition and was told to continue physical therapy and to start on Mobic. *Id.* at 602. On February 3, 2016, Plaintiff again visited MHMC for a pain management follow up visit. *Id.* at 591. Plaintiff reported that her daughter was in hospice and she was unable to go to physical therapy sessions since her last visit in January. *Id.* at 591-92, 595. On March 3, 2016, Plaintiff returned for another pain management follow up visit, and her husband stated that Plaintiff had fallen while walking at a park on February 20, 2016 and hurt her mid back. *Id.* at 588.

5

Plaintiff made further pain management follow up visits on April 27, May 25, and July 14, 2016. *Id.* at 569, 574, 578. On August 23, 2016, Plaintiff underwent a bilateral SI joint injection procedure, which Plaintiff tolerated very well and recovered to stable condition. *Id.* at 567-68.

On January 1, 2017, Plaintiff visited the Center for Families & Children, with her chief complaints consisting of trouble grieving the deaths of 3 family members who all died within a week of one another. *Id.* at 694, 696. Plaintiff endorsed the following symptoms: crying spells, depressed mood, lack of interest in activities, trouble concentrating, trouble getting out of bed, unrestful sleep, racing thoughts, cannot sit still, trouble controlling her anger, fear of leaving the house by herself, hearing voices, having panic attacks, and feeling nervous most of the day. *Id.* at 698. She was provisionally diagnosed with Major Depression with psychotic features and anxious distress. *Id.* She was prescribed Cymbalta, Xanax XR, and further counseling. *Id.* at 704. Plaintiff returned for counseling on February 7 and March 7, 2017. *Id.* at 709, 711. During the March 7, 2017 visit, Plaintiff complained that she had panic attacks 4 times a week, poor sleep, and hears angry voices of dead people. *Id.* at 711.

### **B.** **Testimonial Evidence**

On June 21, 2017, the ALJ held a hearing with Plaintiff and her attorney present, and a vocational expert ("VE") present telephonically. Tr. at 31-33. During Plaintiff's attorney's opening statement, the attorney stated that Plaintiff was "ambulating with a cane today that's prescribed by her physician, Dr. Astley." *Id.* at 36.

On examination by the ALJ, Plaintiff testified that she lives with her husband, takes the bus or has her daughter drive her around, and completed ninth grade and does not have a GED. *Id.* at 38-40. She further stated that she used to work as a caterer around 2001 and 2002. *Id.* at 41. The ALJ found that Plaintiff did not have any past relevant work. *Id.* at 42. She testified that her husband helps with household chores, even though he is disabled. *Id.* at 39-40, 42. Plaintiff stated that she helps with laundry, dishes, and mopping the floor. *Id.* at 42, 45, 47. She also testified that on a typical day she watches television and she tries to help with laundry and dishes, and her hobbies include playing gambling games on her phone and playing with her grandchildren. *Id.* at 45-46, 50.

6

When asked what has prevented her from working, Plaintiff replied it was due to her back and she gets shortness of breath from her chronic obstructive pulmonary disease ("COPD"). *Id.* at 42. She further stated that her treatment for her back includes taking Percocet, Gabapentin and Meloxicam. *Id.* at 42-43. She stated she was given shots for her back but they were ineffective. *Id.* at 43. She stated she gets Ambien for sleep and she has two different types of inhalers for her COPD. *Id.* She testified that she smokes and was using an electric cigarette. *Id.* When asked if there was anything besides her back and breathing problems that kept her from working, Plaintiff stated that sometimes pain shoots down her leg from her spinal cord and she has problems with her right knee. *Id.* at 43-44. She stated she has not had her knee checked since her accident in 2004 because of transportation problems. *Id.* at 44-45.

When asked about using a cane, Plaintiff testified that she has been using a cane for about six to seven months and only as necessary and to prevent her from falling. *Id.* at 47. Plaintiff further testified that she has been seeing a psychiatrist for about four to five months. *Id.* at 48. When asked if any psychological conditions prevented Plaintiff from working, she replied yes because she gets crying spells due to the recent deaths in her family. *Id.* at 48-49. When asked if she had any psychological conditions that prevented her from working prior to the family deaths, she replied yes. *Id.* at 49. She stated she was in a car accident that killed her cousin in October 2004. *Id.* Aside from her crying spells, Plaintiff also stated that other mental conditions that have kept her from working are that she does not like to shower, she does not like being around other people, and she gets paranoid around people. *Id.* at 49.

Upon examination by her attorney, Plaintiff testified that she always wears a back brace that was given to her by MHMC, where she did physical therapy. *Id.* at 51. She also testified that she is able to walk a block to go to the store but it makes her get short of breath. *Id.* When asked if she has issues with sitting for long periods of time, Plaintiff replied not really. *Id.* at 52. She also stated that she has issues bending over at the waist and picking up something off the floor, cannot squat down at the knees, cannot kneel, has issues getting back up, and has issues climbing stairs. *Id.* at 52-53.

7

### III.     **RELEVANT PORTIONS OF THE ALJ'S DECISION**

On October 12, 2017, the ALJ issued a decision finding that Plaintiff was not disabled. Tr. at 12-26. The ALJ stated that Plaintiff had not engaged in substantial gainful activity since April 7, 2015 the date of her application. *Id.* at 17. Continuing, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; COPD; depressive disorders; organic mental disorders; anxiety disorder; post-traumatic stress disorder; and cognitive disorder. *Id.* The ALJ then indicated that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 18.

After consideration of the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b) with the following additional limitations: can lift and carry up to 20 pounds occasionally and 10 pounds frequently; can stand or walk up to 6 hours of an 8-hour workday, and can sit up to 6 hours of an 8-hour workday; can push and pull as much as lift and carry; can climb ramps and stairs occasionally, but never ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, and crouch, but can never crawl; can never work at unprotected heights, and never around moving mechanical parts; can tolerate occasional exposure to humidity, temperature extremes, wetness, dusts, odors, fumes, and pumonary irritants; limited to frequent exposure to vibration; limited to performing simple, routine, and repetitive tasks, but not at a production rate pace; can interact with supervisors, coworkers, and the public frequently; can tolerate only occasional, routine workplace changes. *Id.* at 20.

The ALJ then stated that Plaintiff had no past relevant work, was an individual closely approaching advanced age on the date the application was filed, had a limited education, and could communicate in English. *Id.* at 24. Next, the ALJ indicated that the transferability of jobs skill was not an issue because Plaintiff did not have past relevant work. *Id.* at 25. Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* For these reasons, the ALJ found that

Plaintiff had not been under a disability, as defined in the Social Security Act, since April 7, 2015[5], the date the application was filed. *Id.*

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings

---

[5] Plaintiff's application for SSI was actually filed April 28, 2015. Tr. at 157.

of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). Therefore, even if an ALJ's decision is supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)(quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  LAW AND ANALYSIS

### A.  RFC and Assistive Device

Plaintiff argues that substantial evidence does not support the ALJ's finding that she is capable of performing light work activity because the ALJ erred in finding that she did not need a cane to ambulate. ECF Dkt. # 19 at 8-10.

A claimant's RFC is an assessment of the most that a claimant "can still do despite limitations." 20 C.F.R. §§ 416.945(a)(1). An ALJ must consider all of a claimant's impairments and symptoms and the extent to which they are consistent with the objective medical evidence. 20 C.F.R. § 416.945(a)(2)(3). The claimant bears the responsibility of providing the evidence used to make

a RFC finding. 20 C.F.R. §§ 416.945(a)(3). However, the RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5 (July 2, 2996).

Social Security Ruling ("SSR") 96-8p provides guidance on assessing RFC in social security cases. SSR 96-8p, 1996 WL 374184 (July 2, 1996). The Ruling states that the RFC assessment must identify the claimant's functional limitations and restrictions and assess his work-related abilities on a function-by-function basis. *Id.* Further, it states that the RFC assessment must be based on all of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment, and work evaluations. *Id.*

SSR96-9p addresses the use of an assistive device in determining RFC and the vocational implications of such devices:

> Medically required hand-held assistive device:
>
> To find that a hand-held assistive device is medically required, *there must be medical documentation* establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996) (emphasis added).

SSR 96-9p requires medical documentation of the need for the assistive device, not just a suggestion by a doctor relating to a claimant's continued use of an assistive device that the claimant purchased on his or her own. *Perry v. Berryhill*, 2018 WL 1393275, at *4 (N.D. Ohio Mar. 20, 2018) (Limbert, MJ). When medical records do not contain a prescription for an assistive device, such as a cane, it is insufficient to establish that the device was medically required, even if there was some indications in the medical records to establish that a plaintiff was using the device. *See Parrish v. Berryhill*, 2017 WL 2728394, at *12 (N.D. Ohio June 8, 2017) (Report and Recommendation

11

adopted by District Court in *Parrish v. Berryhill*, 2017 WL 2720332 (N.D. Ohio June 23, 2017)) (finding plaintiff failed to provide medical documentation indicating she was prescribed a cane, as required by SSR 96-9p); *e.g.*, *Blackburn v. Colvin*, 2016 WL 4821766, at *5 (N.D. Ohio Sept. 15, 2016) (noting that plaintiff's use of crutches and a wheelchair to ambulate were not supported by medical documentation as required by SSR 96-9p); *Mitchell v. Comm'r of Soc. Sec.*, 2014 WL 3738270, at *12 (N.D. Ohio July 29, 2014) (finding that plaintiff's testimony regarding his need for a cane did not qualify as "medical documentation establishing the need" under SSR 96-9p).

The undersigned recommends that the Court find that the ALJ applied the proper legal standard and substantial evidence supports his findings that no evidence established that there was a prescription for a cane or that it was medically necessary. Substantial evidence supports the ALJ's discounting of Plaintiff's allegations that she needs to use a cane for ambulation. The ALJ explained why the evidence failed to support that a cane was medically necessary for ambulation. *Id.* at 22. The ALJ noted that there was an "unresulted order" for a cane after a physical therapy visit on November 16, 2015, but this was inconsistent with the October 15, 2015 physical therapy note that Plaintiff "walked into therapy today independent with [a] straight cane." *Id.* at 22 (citing Tr. at 611-12). The ALJ also noted that there was no evidence that Plaintiff's treating pain management physician, Dr. Astley, prescribed a cane, as she testified[6], or that the use of a cane was medically necessary. *Id.* at 22 (referring to testimony at Tr. at 47). Further, the ALJ noted that the record was silent as to Plaintiff's use of a cane for a few physical therapy visits. *Id.* at 22 (citing Tr. at 620-23). Dr. Astley also remarked at a May 25, 2016 exam that Plaintiff "seems very functional." *Id.* at 576. The ALJ stated, without citing to the record, that other physical examinations in the record routinely identified normal gait. *Id.* He further noted that the most recent reference to cane use was during a March 2017 mental health treatment visit, but those treating providers did not comment on Plaintiff's use of the cane or its medical necessity. *Id.* The ALJ stated that there was no evidence of worsening of Plaintiff's physical impairments from the time of the most recent pain management

---

[6] Plaintiff's attorney stated that Plaintiff was prescribed a cane by her physician, Dr. Astley, during her opening statement. Tr. at 36. Plaintiff herself did, however, testify that "they gave me the cane." *Id.* at 47.

12

visit in August 2016. *Id.* The ALJ thus concluded that the weight of the evidence failed to demonstrate that Plaintiff required a cane for ambulation for work-related activities. *Id.*

Although Plaintiff's counsel stated during her opening statement that Dr. Astley prescribed Plaintiff a cane for ambulating, there is no evidence of a presciption in the medical records and there is no evidence that the cane was medically required. *See id.* at 36. Further, Plaintiff did not specifically rebut this finding in her merits brief. *See* ECF Dkt. # 19. Rather, she merely points to her diagnosis of moderately severe degenerative disc disease and her symptoms of back pain, spinal tenderness, and observed antalgic gait and observed use of a cane as early as October 2015 to show that the need for a cane was implied from these circumstances. *See id.* at 9-10. The Court should find that Plaintiff's conclusory testimony is insufficient to qualify as medical documentation under SSR 96-9p, and it is also inconsistent with the medical records. Accordingly, the undersigned recommends that this Court find that the ALJ applied the proper legal standards and substantial evidence supported his decision finding that a cane was not medically necessary. No documentation or prescription existed in the medical records and no evidence in the record established that the use of a cane by Plaintiff was medically necessary.

### B. Opinion Evidence

Plaintiff's second assertion of error is that the ALJ erred in evaluating the opinion evidence by not affording the opinion of Dr. Wax, the agency examining psychologist, considerable weight. ECF Dkt. # 19 at 11. Plaintiff asserts that the ALJ erred in giving more weight to the opinion of the State agency's non-examining psychologist than Dr. Wax because "it is reasonable to conclude that the opinion of a medical source who actually performed a comprehensive psychological evaluation, as well as a battery of psychological tests, would be in a much better position to offer an opinion concerning mental limitations, than a source who merely provided a review of the medical records in evidence." *Id.* at 11-12. Plaintiff further states that Dr. Wax's opinion was supported by his own findings on exam, test scores, and the rest of the documentary and testamentary records. *Id.* at 12.

In his decision, the ALJ stated that "[a]s for the opinion evidence regarding claimant's mental impairments, no treating source offered a statement explaining the claimant's work-related limitations." Tr. at 23. He then considered the opinions of both Dr. Wax, Ph.D., and the State agency

13

reviewing psychological consultant, Dr. Lai, Psy.D. *Id.* at 23-24. State agency consultants are highly qualified specialists and experts in Social Security disability evaluation. SSR 96–6p, 1996 WL 374180, at *1-2 (July 2, 1996). The Code of Federal Regulations describes how medical opinions must be weighed. Under Social Security regulations governing weight to be accorded to medical opinions, "acceptable medical sources" specifically includes licensed physicians and licensed psychologists. *See* 20 C.F.R. § 404.1513(a)(1) & (2) (effective Sept. 3, 2013 to Mar. 26, 2017); 20 C.F.R. § 416.913(a)(1) & (2) (effective Sept. 3, 2013 to Mar. 26, 2017); 20 C.F.R. § 416.927(a)(1); 20 C.F.R. § 404.1527(a)(1); SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006). This rule extends to State agency psychological consultants. 20 C.F.R. § 416.927(e); 20 C.F.R. § 404.1527(e). Unless the ALJ gives a treating source's medical opinion controlling weight, the ALJ must weigh the opinion based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2) (now codified as 20 C.F.R. § 404.1527(c)). These factors include the examining relationship, the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, the specialization of the treating source, and any other relevant factors. 20 C.F.R. § 416.927(c)(1)-(6); 20 C.F.R. § 404.1527(c)(1)-(6). However, an ALJ is not required to explain why he favored one examining opinion over another because the "good reasons" rule requiring an ALJ to explain the weight afforded a treating physician's opinion does not apply. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508 (6th Cir. 2006). Moreover, ALJs are not bound by the findings of a state agency psychologist, "but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996). Although the ALJ is not required to address each factor, or explicitly provide good reasons (as he is for treating physicians), the ALJ's decision must say enough "to allow the appellate court to trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (internal citation omitted). Also, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. SSR 96-6P, 1996 WL 374180, at *3 (July 2, 1996). The ALJ

specifically considered the opinions of both Dr. Wax and Dr. Lai in this case. Tr. at 24. While, the ALJ did not specify the level of weight that he afforded to Dr. Wax's opinion, he did state that he gave more weight to the opinion of the State agency psychological reviewing consultant, Dr. Lai. *Id.* He explained that although Dr. Wax examined Plaintiff, Dr. Lai's opinion was more consistent with the record as a whole. *Id.*

The undersigned recommends that the Court find that the ALJ applied the proper legal standards in evaluating the opinions of Dr. Wax and Dr. Lai, as neither are treating physicians.

The ALJ noted that Dr. Lai opined that Plaintiff was capable of a range of simple, routine, repetitive tasks with normal work breaks where changes would be infrequent and routine in nature. Tr. at 24. The ALJ found that Dr. Lai's opinion gave adequate consideration to findings of borderline intellectual functioning and decreased stress tolerance, and it was consistent with the wide range of retained daily activities that Plaintiff reported performing, such as caring for her terminally ill daughter, shopping with her other daughter, completing prison work assignments, and performing self care. *Id.* at 19, 24. The ALJ assigned her assessment greater weight, explaining that her opinion was consistent with the routine observations of Plaintiff's treating sources, which indicated that Plaintiff was alert, oriented, cooperative, and did not demonstrate any deficits in understanding or carrying out medical instructions. *Id.* at 24.

As to Dr. Wax's opinion, the undersigned recommends that the Court find that the ALJ was reasonable in affording less weight to Dr. Wax's opinion. He noted that Dr. Wax suggested that Plaintiff could not concentrate to maintain full time employment and would have difficulty tolerating typical word related stress. Tr. at 24. The ALJ further noted that Dr. Wax also performed testing at a subsequent session, the results of which demonstrated borderline intellectual functioning. *Id.* The ALJ found that "the evidence failed to demonstrate that level of concentration deficit or stress intolerance as set forth in [Dr. Wax's] opinion." *Id.* For support, the ALJ noted that Plaintiff admitted that she had no difficulty in carrying out the simple, routine tasks involved in her prison work assignments despite her limited work history. *Id.* He also stated that Plaintiff exhibited the ability to perform routine self-care and chores reliably throughout the period and reported limitations with carrying those out only due to her physical symptoms. *Id.* Further, the ALJ found that

15

Plaintiff's performance at the consultative examination with Dr. Wax was not fully consistent with her presentation elsewhere in the record. Specifically, Dr. Wax's records noted that Plaintiff was falling asleep throughout the evaluation, but the ALJ noted that this behavior was not observed by any treating source, even in the contemporaneous progress notes around the time of that July 2015 examination, suggesting that this snapshot was not representative of Plaintiff's daily functioning. *Id.* The ALJ also stated that the neurological evaluation of Plaintiff revealed no deficits or significant organic changes in the brain to explain her intermittent episodes of confusion and memory loss. *Id.* Ultimately, the ALJ concluded that Plaintiff's functioning, including caring for her daughter in hospice while managing her own self-care and medical services suggested adequate cognitive functioning, comprehension, and memory to carry out simple, routine, low-stress job tasks on a sustained basis. *Id.*

Based upon this, the undersigned recommends that the Court find that the ALJ applied the proper legal standards in reviewing the opinions of Drs. Wax and Lai and determining Plaintiff's RFC. The undersigned further recommends that the Court find that substantial evidence supports the ALJ's assessment of the opinions of Drs. Wax and Lai.

## VII. CONCLUSION

For the foregoing reasons, the undersigned recommends that this Court AFFIRM the decision of the ALJ and dismiss the instant case in its entirety with prejudice.

DATE: June 14, 2019                     */s/George J. Limbert*
                                        GEORGE J. LIMBERT
                                        UNITED STATES MAGISTRATE JUDGE